# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SUSAN DECAROLIS, | : | CASE NO. 3:13-cv-00136-GBC |
| | : | |
| Plaintiff, | : | (MAGISTRATE JUDGE COHN) |
| | : | |
| v. | : | MEMORANDUM TO DENY PLAINTIFF'S |
| | : | APPEAL |
| CAROLYN W. COLVIN, | : | |
| ACTING COMMISSIONER OF | : | Docs. 6,7,8,11,12 |
| SOCIAL SECURITY, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM TO DENY PLAINTIFF'S APPEAL

### I. Procedural History

On January 3, 2009, Susan Decarolis ("Plaintiff") protectively filed an application for Title II Social Security Disability benefits ("DIB"), and a Title XVI application for Supplemental Security Income ("SSI"), with an alleged onset date of December 12, 2009. (Tr. 117-125, 167).

This application was denied, and on February 28, 2011, a hearing was held before an Administrative Law Judge ("ALJ"), where Plaintiff appeared with counsel and testified, as did a

vocational expert (Tr. 57-95). On March 10, 2011, the ALJ issued a decision finding that Plaintiff was not entitled to DIB or SSI because Plaintiff could perform the following jobs of at a reduced range of medium, unskilled work: laundry worker, dry clean checker, and janitor / cleaner, and was therefore not disabled within the meaning of the Social Security Act (Tr. 28, 34-35). On July 9, 2012, the Appeals Council denied Plaintiff's request for review, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 20, 204-207, 6-9).

On January 18, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. §§ 405(g); 1383(c)(3), to appeal a decision of the Commissioner of the Social Security Administration denying social security benefits. Doc. 1. On April 24, 2013, Commissioner filed an answer and administrative transcript of proceedings. Docs. 5,6. In June and August 2013, the parties filed briefs in support. Docs. 7,8,11,12. On May 1, 2014, the Court referred this case to the undersigned Magistrate Judge. On May 20, 2014, the parties consented to Magistrate Judge jurisdiction, and Plaintiff notified the Court that the matter is ready for review. Doc. 14.

## II.    Standard of Review

When reviewing the denial of disability benefits, we must determine whether the denial is supported by substantial evidence. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Johnson v. Commissioner of Social Sec., 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 564 (1988); Hartranft v. Apfel, 181 F.3d 358, 360. (3d Cir. 1999); Johnson, 529 F.3d at 200.

This is a deferential standard of review. See Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence is satisfied without a large quantity of evidence; it requires only "more

than a mere scintilla" of evidence. <u>Plummer v. Apfel</u>, 186 F.3d 422, 427 (3d Cir. 1999). It may be less than a preponderance. <u>Jones</u>, 364 F.3d at 503. Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. <u>Monsour Med. Ctr. v. Heckler</u>, 806 F.2d 1185, 1190 (3d Cir. 1986).

To receive disability or supplemental security benefits, Plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A).

Moreover, the Act requires further that a claimant for disability benefits must show that he has a physical or mental impairment of such a severity that: "he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

### III. Relevant Facts in the Record

### A. Background

Plaintiff, who was 46 years old at the time the she alleges she became disabled and 49 years old on the date of the ALJ's decision, has a sixth grade education and reads at a sixth grade level (Tr. 117, 69, 70). She has past relevant work as a fast food worker and a school crossing guard. (Tr. 34,

86, 160).

The Administrative Law Judge found Plaintiff had severe impairments of a learning disorder by history, generalized anxiety disorder, depressive disorder, mood disorder, personality disorder, dependent type, post traumatic stress disorder, low back syndrome, and marijuana abuse. (Tr. 26).

Plaintiff stated that she went outside about five or six times a week; shopped in stores for clothing and food about once a month; spent time with her sister, brother, and other family members; and talked with family members by telephone (Tr. 182, 185-86). She reported no problems getting along with family, friends, neighbors, or others (Tr. 187). She got along very well with authority figures, and never had a problem getting along with other people on the job (Tr. 188).

## B. Relevant Medical Evidence

1. On November 11, 2008, Plaintiff was treated at the Emergency Department of Jamaica Hospital in Jamaica, New York for her complaints of mid-to-low back pain, rated at 10/10. Her medical history was notable for depression, anxiety, and panic attacks. She was ambulating with a limp. Diagnosis was chronic back pain (Tr. 209-211). Plaintiff's "medical history . . . notable for depression, anxiety, and panic attacks" appears based exclusively on Plaintiff's subjective statements as there is no indication that the emergency room medical personnel had access to any of Plaintiff's medical records (Tr. 211). Plaintiff spent a total of two hours in the emergency department (Tr. 209-10). Although Plaintiff was observed ambulating with a limp, no neurological deficits were noted (Tr. 211). The diagnostic impression of "chronic back pain" was apparently based solely on Plaintiff's subjective complaints and the observations of the emergency room medical personnel as there is no indication that any diagnostic or clinical testing was performed (Tr. 210). Specifically, there are no entries on the discharge form indicating that any radiology testing was performed (Tr.

210).

2. In a December 9, 2008 report, Patricia Berliner, Ph.D. of Ozone Park, New York, states that she has seen Plaintiff for psychotherapy five times since September, 2008. Plaintiff had been in abusive relationships for much of her life, starting with sexual abuse by her father when she was very young. Currently, she was being abused by her husband. Her husband was going to move to Florida and Plaintiff expressed that she was not willing to continue being abused by him but was concerned about how she would manage emotionally and financially without him. Dr. Berliner described Plaintiff as "an emotionally fragile person, a situation exacerbated by medical problems and limitations, as well as fear of her husband and concerns about her future." She was taking medication for pain and depression and was struggling to pull things together. According to Dr. Berliner: "It is my assessment that she is not emotionally able to work at this time" (Tr. 258). After offering her opinion that Plaintiff was "not emotionally able to work at this time," Dr. Berliner, a psychologist, added that "[Plaintiff's] medical doctors would be the appropriate contacts to assess her physical limitations" (Tr. 258).

3. On March 18, 2009, when Plaintiff was seen by Dr. Albert Alley. D.O. in Hazleton, Pennsylvania, it was noted that she had recently moved from New York. She was complaining of persistent depression increasing in severity. Plaintiff told Dr. Alley that as a child, she was sexually abused by her father. Her mother committed suicide. Plaintiff recently separated from her husband who was abusive toward her and sexually abused her daughter. She described feeling sad and blue, having difficulty sleeping (getting 1-4 hours of sleep,) and having episodes of spontaneous crying. Her other complaints were of low back pain and stiffness, and neck pain. Current medications were Celexa, Valium, Flexeril, Naproxen, and Robaxin. On examination, Plaintiff appeared depressed.

She "displays or has experienced abnormal or psychotic thoughts including suicidal ideation." No musculoskeletal examination was conducted. Dr. Alley's impression was: (1) Anxiety/Depression for which he prescribed Abilify, Celexa, and Valium; (2) Persistent Insomnia; (3) Cervicalgia (4) Abuse by Partner; (5) Bipolar Disorder, NOS; and, (6) Fibrosclerosis, breast. Laboratory testing was ordered (Tr. 284-285). Plaintiff stated that her back pain was precipitated by heavy weight lifting, and has developed "due to many years of heavy lifting and improper body mechanics" (Tr. 284). She said that her symptoms were aggravated by exertion and weight lifting (Tr. 284). Although Dr. Alley assessed anxiety and depression, he noted that, on mental status and neurological examination, Plaintiff was alert, fully oriented, and cooperative (Tr. 285). She displayed no impairment of her recent or remote memory, and she had normal sensation and normal coordination (Tr. 285).

4. In follow-up at Dr. Alley's Hazleton office on April 15, 2009, Plaintiff was seen by Dr. Glenda Buyo, M.D. who noted that Plaintiff's back pain – which had been increasing over the last year – was stabbing in nature and located in the lumbar area. It radiated to her neck and was precipitated by bending, prolonged walking, and heavy lifting. There were no relieving factors. Muscle spasms and back stiffness were also present. Plaintiff reported that her pain medication was not working. Her sleep was disturbed; she said that she only got 1-4 hours of sleep at night. Examination revealed point tenderness over the lateral part of Plaintiff's thoracic lumbar area; decreased sensation; "no step off"; extension and flexion limited to less than 25°; positive straight leg test; and, decreased strength (2/5) of the lower extremities bilaterally. Dr. Buyo's assessment was: (1) Cervicalgia for which Plaintiff was to continue taking Naproxen; (2) Insomnia for which Ambien was prescribed; and, (3) Anxiety/Depression for which Plaintiff was to continue taking Celexa and Abilify. It was noted that Plaintiff needed an MRI of the thoracic/lumbar spine (Tr.

282-283).

5. Six days later, on April 21, 2009, Plaintiff returned to Dr. Buyo stating that her pain medications were not helping. Her lumbar pain was constant. It radiated to her neck and also from the left to the right side of her low back. Examination was the same as at the previous visit. Dr. Buyo added Ultram and Flexeril to Plaintiff's regimen (Tr. 280-281). A review of systems indicated no neck pain or swollen glands; no joint pain, muscle pain, or swelling of extremities; no decreased memory, dizziness, paresthesia (i.e., burning or prickling), or weakness; and no anxiety, depression, mood changes or suicidal ideation (Tr. 280).

6. Plaintiff presented to Dr. Buyo on May 5, 2009 complaining of a headache, moderate in severity. She said that she had been having headaches for months. Examination was unchanged from Plaintiff's previous visit. Her dose of Naproxen was increased. Assessment was: (1) Insomnia; (2) Back pain; and, (3) Anxiety/Depression (Tr. 278-279). A review of systems indicated no neck pain or swollen glands; no joint pain, muscle pain, or swelling of extremities; no decreased memory, dizziness, paresthesia, or weakness; and no anxiety, depression, mood changes or suicidal ideation (Tr. 278).

7. On May 11, 2009, Plaintiff was seen at Northeast Counseling Services in Hazleton, Pennsylvania for a Psychosocial Evaluation conducted by Marilyn Brenner, B.A. Presenting problems were depression characterized by tearfulness, decreased motivation and interest, and sleep disturbance; anxiety with shakiness, sweating, muscle tightness, palpitations and panic attacks; and, hearing good and bad voices. She had a history of physical, verbal, and sexual abuse. Psychosocial stressors stemmed from an abusive relationship from which she had removed herself, relocating, and physical (back) problems. She saw a therapist when she was living in New York (Tr. 232-234).

Plaintiff refused a referral for a partial hospitalization at the Destinations Program but agreed to an outpatient psychiatric evaluation (Tr. 237-238). When Plaintiff agreed to an outpatient psychiatric evaluation, her expressed goals were to "get 'thru' and be happy again" and to "live her life" (Tr. 237).

8. On May 20, 2009, when Plaintiff presented to Dr. Buyo with a cough, she told the doctor that her sub-orbital edema was due to insomnia. The doctor prescribed Nasonex for allergic rhinitis (Tr. 276). Examinations of Plaintiff's nose and sinuses, mouth and throat, and chest and lungs were all normal (Tr. 276).

9. On June 3, 2009, Plaintiff told Dr. Buyo that she had been having constant headaches over the past two weeks, located in the frontal area. Her back and neck pain was not improving with physical therapy. Range of motion of Plaintiff's neck was full with mild pain. She was referred to pain management for her back pain and treated with an antibiotic for a sinus infection (Tr. 274). Mental status examination indicated that Plaintiff was alert, fully oriented, cooperative, and well groomed (Tr. 274). Examinations of her head, ears, eyes, nose and sinuses, and mouth and throat were all normal (Tr. 274).

10. Psychiatrist Nilesh Baxi, M.D. of Northeast Counseling Services performed an initial psychiatric evaluation of Plaintiff on June 10, 2009. Plaintiff told Dr. Baxi that she was separated, had a seventh grade education and was unemployed. Before moving to Pennsylvania in December, she saw a therapist in New York for a couple of months. Her history included sexual abuse by her father for a almost year at around age 10. Her husband was abusive to her and sexually abused her daughter. Plaintiff reported crying a lot, thinking about the past, and having frequent flashbacks. She had difficulty sleeping. She had been thinking about suicide for a great deal of her life but said she

would not act on it because of her children (daughter age 22 and son age 17.) Plaintiff said that she smoked marijuana for a couple of months about a year earlier. Her mother committed suicide. Plaintiff reported having back and neck problems (Tr. 226-227). Dr. Baxi observed that Plaintiff appeared older than her stated age. Her motor activity was slightly increased and thought flow was tangential. She denied hallucinations. Her mood was sad and her affect, appropriate. She was tearful at times during the interview. Her insight was poor. Diagnosis was: Axis I: Posttraumatic Stress Disorder Depression, NOS Axis II: deferred Axis III: neck and back problems Axis IV: moderate Axis V: 50 (Tr. 227). Dr. Baxi instructed Plaintiff to discontinue Abilify because she was experiencing side effects. She was to continue Celexa. Because of her extensive history of abuse and emotional problems, "she is medically appropriate to be in the Destinations Program and she has agreed to do it" (Tr. 228). Plaintiff specifically denied any psychotic symptoms or mood swings; she stated that she had never seen a psychiatrist before, and denied any prior psychiatric hospitalization (Tr. 226). Mental status examination revealed her to be alert and oriented to time, place, person, and situation (Tr. 227).

11. On June 30, 2010, Plaintiff underwent an initial psychiatric evaluation by psychiatrist P.S. Sriharsha, M.D. of the Destinations Program of Northeast Counseling Services. Plaintiff's history of abuse was noted. Her abusive husband had moved to Florida. She admitted to a history of separating from her husband and then getting back with him. She moved to this area because she had family here. Medically, she had a history of back pain, neck pain, and headaches. She was taking Celexa, Naprosyn, Valium, Tramadol, and Ambien. Dr. Sriharsha observed that Plaintiff's gait was fair. Her anxiety level was moderate. Her affect was unhappy and sad. Her short-term plans, judgment, and insight were questionable and her reliability was fair (Tr. 229-230). Diagnosis was:

Axis I: Posttraumatic Stress Disorder Depressive Disorder, NOS Relationship Problems, NOS Axis II: no diagnosis Axis III: neck and back pain Axis IV: trauma issues Axis V: GAF: 40. Dr. Sriharsha recommended that Plaintiff be placed in the Destinations partial hospitalization program, finding it "is medically and therapeutically necessary given her history of trauma." The doctor believed that with treatment, Plaintiff's depression and coping skills would improve (Tr. 230). Upon mental status examination, Plaintiff was awake, alert, and cooperative; her gait was fair; her personal hygiene was good; her speech was clear, coherent, relevant, spontaneous, and productive; she had average reaction time; her anxiety level was moderate; she denied any suicide intent; there was no indication of any formal thought disorder; she had good memory functioning and retention recall; her attention and concentration were good; she was fully oriented to time, place, and person (Tr. 230).

12. Plaintiff was hospitalized at First Hospital of Wyoming Valley in Kingston, Pennsylvania from July 9, 2009 through July 17, 2009. She was admitted following a two-day period of suicidal thoughts, homicidal threats concerning her husband, and an attempt to overdose on medication On the date of her admission, her mood was anxious and depressed but she denied suicidal or homicidal ideation. She was able to contract for safety. Her speech was slow. She was admitted for supportive individual and group therapy and treatment with medication (Tr. 243-244). During her stay, Plaintiff was treated with Valium, Celexa, Seroquel, and Lithium (as well as Robaxin, and Naproxen) and individual and group therapy. Valium was gradually decreased and discontinued. Diagnoses were: Bipolar Disorder, Depressed; and Marijuana Abuse. Plaintiff admitted to drinking alcohol sporadically and smoking marijuana four times a month but she declined the recommendation for outpatient drug and alcohol treatment. On discharge, she agreed to attend the partial hospitalization program and go to her first appointment on July 21, 2009. Her prognosis was considered fair to good

(Tr. 240-241). During the course of her in-patient treatment, Plaintiff responded to treatment and showed improvement, with no suicidal ideas or psychotic symptoms (Tr. 241). At the time of her discharge, Plaintiff had done well with remission of her presenting problem (Tr. 241). Her mood, thinking, and behavior were stable with no suicidal or homicidal ideas, unstable mood, or problems with her medication (Tr. 241).

13. On July 20, 2009, in follow up with Dr. Buyo, Plaintiff needed refills of her medications. She said that she was no longer feeling suicidal since being released from the hospital. Dr. Buyo observed that Plaintiff's speech was monotonous with flight of ideas. Medications were refilled and Plaintiff was referred for sleep studies because of her insomnia. Bipolar Disorder was added to her diagnoses (Tr. 272-273). Plaintiff presented in no acute distress, and was alert and fully oriented (Tr. 272). Her mood and affect were normal; her judgment and insight were appropriate; and although she displayed some flight of ideas, there was no attention deficit and no impairment in reading comprehension or problem solving (Tr. 272).

14. On July 21, 2009, as scheduled during her hospitalization, Plaintiff returned to Dr. Sriharsha at the Destinations Program. She told the doctor that she wanted to be referred to outpatient services rather than continuing at Destinations because she felt uncomfortable in group settings. After a discussion with Plaintiff's treatment team, Dr. Sriharsha approved this change (Tr. 451).

15. When Plaintiff presented to Dr. Buyo on August 5, 2009 for refills of her Seroquel and muscle relaxants, she reported that her depression had improved somewhat but she was feeling anxious three times a week. Dr. Buyo said that she would consider increasing Plaintiff's dose of Mirapex next month. Restless legs syndrome was added to Plaintiff's diagnoses (Tr. 270-271).

Plaintiff reported that she was feeling well, with some anxiety, but no depression (Tr. 270). Mental status and neurologic examinations revealed that she was alert, fully oriented, cooperative, and well-groomed (Tr. 270-71). She had a normal posture and gait (Tr. 270). There was no impairment in her recent or remote memory; she had a normal attention span and ability to concentrate; her fund of knowledge was appropriate; and she exhibited normal sensation and coordination (Tr. 271).

16. Nine days later, on August 14, 2009, Plaintiff told Dr. Buyo that she wanted to stop taking Seroquel and Lithium because they were making her feel nauseated, lightheaded, and weak. She requested a refill of Celexa. Plaintiff was told to continue taking Seroquel and Lithium but take them at night. Celexa was also continued (Tr. 268-269). Plaintiff reported no anxiety or depression on her new medications (Tr. 268). Examination indicated that she was alert, cooperative, fully oriented, and not anxious or in acute distress (Tr. 269).

17. On August 19, 2009, when Plaintiff was seen by psychiatrist Dr. Baxi at Northeast Counseling, she told him that he was referred back to him after expressing that she did not want to remain in the Destination Program. She said that she was doing better on her Seroquel, Celexa, and Lithium. Dr. Baxi noted that Plaintiff "is providing different information at different times." For example, although Plaintiff told Dr. Baxi that she had only used marijuana for a few months before she was hospitalized in July, at the hospital she reportedly admitted to daily use of marijuana for 30 years. On mental status examination, Plaintiff's mood was "a little bit sad" and her affect was constricted. Her insight was "very poor." Axis I diagnoses were Mood Disorder, NOS; Posttraumatic Stress Disorder; and, Marijuana Abuse. Axis III diagnoses were chronic neck and back pain. Plaintiff was to continue on her current medications. She was referred to a counselor for therapy and told to return in a month (Tr. 435).

18. On an assessment form dated August 28, 2009, psychologist Patricia Berliner, Ph.D. [see

paragraph 2,] states that she treated Plaintiff during the period September 8, 2008 through December 9, 2008 and has not been in contact with her since that time. Dr. Berliner assesses a slight limitation in Plaintiff's ability to make judgments on simple work-related decisions; interact appropriately with the public, supervisors, and co-workers; and, respond appropriately to work pressures in a usual work situation. She assesses a mild-to-moderate limitation in Plaintiff's ability to respond appropriately to changes in a routine work setting and a moderate limitation in Plaintiff's ability to understand, remember, and carry out detailed instructions. Dr. Berliner states that she based her assessment on Plaintiff's own description of how she handles work and life-related stressors (Tr. 250-251).

19. On September 9, 2009, Plaintiff presented to Dr. Buyo requesting a refill of Valium. She reported having a decreased energy level with poor sleep. She was sleeping about 5 hours a night (Tr. 266).

20. On September 11, 2009, Plaintiff was seen by Dr. Baxi's colleague, certified physician's assistant Dorothy Perillo. Ms. Perillo noted that Dr. Buyo had decreased Plaintiff's Lithium because of side effects (dizziness and nausea) which improved with the decreased dose. Although Plaintiff's depression had improved, she continued to have down days, missing her mother who committed suicide 8 years earlier. She was sleeping about 5 hours at night and her appetite varied. Her anxiety was high some days and she took Valium. When she prays, she hears her mother's voice and at times, she sees visions of her mother at night. She said that she had not smoked marijuana for 2 months. Mental status examination was unremarkable except for Plaintiff's fair insight and decreased sleep. Plaintiff's GAF was 55.[1] Seroquel was increased, to be taken at bedtime (Tr. 436).

---

[1] A global assessment of functioning (GAF) of 55 that Ms. Perillo assessed indicates only moderate symptoms or moderate difficulty in social or occupational functioning. See Diagnostic and Statistical Manual

21. On October 19, 2009, in follow-up with Dr. Buyo, Plaintiff was complaining of increasing depression. She said that she felt tired and lacked energy. Anxiety was also present as were sleep problems, mood changes, frequent crying, and panic attacks. Plaintiff appeared depressed and restless. Although she was anxious, depressed and sad, she was not agitated. Ultram was not helping. Her medications were adjusted; she was told to take Abilify, Celexa, Seroquel, and Lithium, the latter two at bedtime (Tr. 408-409).

22. On November 18, 2009, Plaintiff was seen by state agency examining psychologist Frank James Vita, Ph.D. in Hazleton, Pennsylvania. Dr. Vita, who reviewed records including some from Northeast Counseling, performed a clinical interview and administered the Mini-Mental State Examination ("MMSE"). Plaintiff told Dr. Vita that she dropped out of school in 8th grade after failing 6th and 7th grades and worked as a receptionist for a couple of months. After that, she worked for short periods at several fast food places and for 8 years as a school crossing guard. Her history of abuse was noted. At this time, she was taking Seroquel, Celexa, and Valium. She said that in the past, she used marijuana but only about twice a month. She admitted to hallucinations: seeing her deceased mother (who may have committed suicide) and hearing her father's voice (Tr. 314-315). On mental status examination, Plaintiff's affect was restricted and her mood, labile. Her insight appeared poor and her judgment, fair though based on her history, she had a poor ability to delay gratification and a poor ability to tolerate frustration. Dr. Vita reported that Plaintiff could not complete serial sevens accurately, could not spell the word 'world' backwards, and her recall was poor: she could remember only one of three words following a two-minute interval. She could recall 5 digits forward but only 3 backwards. Her visuo-spatial ability was poor. Her ability to find similarities between items/words was intellectually deficient as was her fund of information,

---

of Mental Disorders (DSM-IV) 32 (American Psychiatric Association 4th ed. 1994).

comprehension, and calculations. Her vocabulary was below average. MMSE testing revealed a raw score of 21, suggesting a mild cognitive impairment but one that required further investigation (Tr. 316-317). Dr. Vita's diagnostic impression was: Axis I: Generalized Anxiety Disorder Dysthymic Disorder, Early Onset, Chronic Cannabis Abuse Reported victim of sexual abuse as a child Axis II: Dependent Personality Disorder Axis III: Degenerative Disc Disease Restless Leg Syndrome Allergies Multiple cysts on breast Axis IV: Severe economic problems, health problems, occupational problems, chronic family problems Axis V: Current GAF = 50. Dr. Vita opined that Plaintiff would likely benefit from the psychiatric medication management and counseling in which she was participating. He recommended a neurological evaluation based upon her MMSE score and also suggested a drug and alcohol evaluation (Tr. 317). Dr. Vita prefaced the recitation of Plaintiff's family history with the proviso that "such histories are subjective . . . . Family narratives are complex and prone to biases by the narrator's own history, perceptions, beliefs, and schemas." (Tr. 314). Plaintiff stated that she was sexually molested by her biological father at age 10 and that, although she reported the incident, her father "never went to jail, except for one night." (Tr. 315). Plaintiff further stated that she allowed her own daughter to be abused by the child's stepfather (Plaintiff's husband) because she "needed" her husband (Tr. 315). Plaintiff stated that "He would hit her, beat her up and I let it happen" (Tr. 315). As to Plaintiff's mother's purported suicide, Dr. Vita said there was some question about that inasmuch as the mother was diabetic and Plaintiff stated that her mother "purposely" ate sugar to kill herself (Tr. 315). Dr. Vita was not able to document that matter (Tr. 315). Despite her restricted affect and labile mood on mental status examination, Plaintiff nonetheless exhibited appropriate dress and good hygiene; her gait and posture were normal; her motor behavior during the interview was normal; she was alert, and her speech was normal; her thought processes were generally logical and coherent; she denied suicidal or homicidal ideation or

problems with common compulsions; and although her insight appeared to be poor, her judgment was generally fair (Tr. 316).

23. On a November 19, 2009 assessment form, Dr. Vita opines that Plaintiff is moderately limited in all ten mental work-related functions listed on the form (Tr. 319).

24. On November 21, 2009, Plaintiff was seen and treated in the Emergency Department of Hazleton General Hospital for neck and back pain, rated at 10/10. She appeared distressed and her affect was flat. She reported that she was out of Valium. She was given injections and a Medrol Dosepak and told to follow up with her doctor on Monday (Tr. 321-327). Although Plaintiff's affect was assessed as flat, her thought pattern was logical and organized, her memory was intact, and her mood was stable (Tr. 324).

25. On November 23, 2009, when Plaintiff was examined by state agency doctor Barbara Vilushis, D.O. in Hazleton, Pennsylvania, she said that her mid-to-low back pain was from herniated/bulging discs which she claimed to have re-injured two days earlier while doing some lifting. She had not had MRIs or CT scans because they were not covered by her insurance; her doctors in New York reportedly told her that she had herniated/bulging discs. She had physical therapy which was not helpful (Tr. 328). Plaintiff had been using a cane for balance for the past two days. She described her pain as generally in her mid-back and shooting up to her neck and down to her low back. She reported having generalized weakness and said that she could not sit or stand for any length of time. She also reported having severe depression and anxiety and a history of mental, physical, and sexual abuse. She said that she had visions of her deceased mother (who may have committed suicide and may have died after being in a diabetic coma) and heard her father's voice. She also had insomnia and sleep apnea (Tr. 329). Current medications were Seroquel, Naproxen, Valium, and Celexa. Plaintiff described herself as a social drinker and denied using recreational

drugs. She said that she has a seventh grade education. She reported having lost about 6 pounds in the last few months and said she felt generally weak. She had nausea and diarrhea which she attributed to stress (Tr. 330). On examination, Plaintiff cried out when moving. Her spine was exquisitely tender all over. She walked very, very slowly with a cane but did not appear to have an antalgic gait. Her affect was depressed and she talked a lot about her past abuse and her mother (Tr. 331-332). Range of motion was remarkable for: shoulder abduction to 140° (out of 150°) bilaterally; backward hip extension to 20° (out of 30°) bilaterally; hip abduction to 30° (out of 40°) bilaterally; hip adduction to 10° (out of 20°) bilaterally; cervical spine lateral flexion to 30° (out of 40°) bilaterally; lumbar spine flexion/extension to 75° (out of 90°); lumbar lateral flexion to 10° (out of 20°) bilaterally; and, ankle plantar flexion to 35° (out of 40°) on the right (Tr. 336-337). Dr. Vilushis's impression was: (1) Chronic back pain, etiology unclear; (2) Depression; and, (3) Insomnia. The doctor said that she could not say what Plaintiff's prognosis was for her back impairment because of the lack of a clear diagnosis. "She does have difficulty with coping skills and so I believe that some of the back pain is psychosomatic, however, I cannot be sure." The doctor believed that Plaintiff's psychiatric problems were likely to be long-term (Tr. 332). On an accompanying assessment form, Dr. Vilushis opines that Plaintiff could occasionally lift and carry 10 pounds and could frequently lift and carry 2-3 pounds. She had unspecified limitations in using her upper and lower extremities for pushing/pulling. In an 8-hour workday, she could sit for a total of 4 hours and stand/walk for 1 hour or less. She needed a cane for balance (Tr. 334). She could occasionally stoop but could never bend, kneel, crouch, balance, or climb. She had an unspecified limitation in reaching. Environmentally, she would be limited in her ability to be around heights, moving machinery, vibration, and humidity (Tr. 335). Plaintiff indicated that she originally injured her back when she was packing to leave her husband and was lifting a lot of boxes (Tr. 328). She

re-injured her back on this occasion after doing some lifting, which she knew she was not supposed to do (Tr. 328). When asked how she knew that her discs were herniated and bulging, Plaintiff stated that her doctor in New York told her that (Tr. 328). But she has not seen a back doctor or orthopedic physician and has not seen pain management nor had any injections (Tr. 328). She cannot do any heavy lifting (Tr. 328). Plaintiff's review of systems, neurologically, indicated no dizziness, vertigo, syncope, seizures, paralysis, or numbness (Tr. 330). She was in no acute distress, but when she moved, "she does mourn and cry out" (Tr. 331). She was alert and fully oriented (Tr. 331). Although she was using a cane in her right hand and was walking very slowly, she did not appear to have an antalgic gait (Tr. 332). When reporting on Plaintiff's psychiatric examination, Dr. Vilushis stated that Plaintiff "tended to go on and on about the abuse both physical and mental that she had suffered and she was also somewhat obsessed about her mother and the suicide attempt" (Tr. 332). Dr. Vilushis stated that Plaintiff's range of motion "is actually quite good considering her complaints" but that assessment was difficulty because Plaintiff "would cry out even on slight movement" (Tr. 332). Dr. Vilushis felt that Plaintiff's back pain was partly psychosomatic (Tr. 332).

26. On November 25, 2009, when Plaintiff was seen by Dr. Buyo in followup, her back pain was worsening and radiating down her right leg with associated leg weakness, hip pain, and back stiffness. She also had neck pain radiating down her back. Medication was not helping. She continued to have difficulty with sleep but did not think that it was pain-related. Dr. Buyo observed that Plaintiff had a sciatic list; she was using a cane and limping. X-rays of her lumbar spine and cervical spine were recommended (Tr. 403-404).

27. Non-examining state agency reviewer Louis Bonita, M.D. completed an assessment form on December 29, 2009. Dr. Bonita opined that Plaintiff suffered from Low Back Syndrome but retained the residual functional capacity to lift, carry, push, and pull 10 pounds and occasionally lift,

carry, push, and pull 20 pounds. In an 8-hour workday, Plaintiff could stand/walk about 6 hours and sit about 6 hours. She had no postural or environmental limitations (Tr. 348-354).

28. On January 8, 2010, Plaintiff was seen by Dorothy Perillo in follow-up at Northeast Counseling Services. Her depression and anxiety peristed and she was crying on a daily basis. She had 2 or 3 panic attacks a day. She had trouble falling asleep and was sleeping about 4-5 hours. She continued to hear her mother's voice. Celexa was restarted and BuSpar was added for anxiety (Tr. 439). Despite Plaintiff's subjective complaints, her mental assessment on examination was essentially unremarkable (Tr. 439). There was no diagnosis for Axis II, which would have indicated a personality disorder (Tr. 444). See DSM-IV at 27.

29. Non-examining state agency reviewer John Grutkowski, Ph.D. completed a Psychiatric Review Technique form on January 19, 2010. Dr. Grutkowski opines that Plaintiff's Depressive Disorder, NOS; Generalized Anxiety Disorder; and, Personality Disorder, Dependent Type impose mild restrictions in her activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and have resulted in one or two episodes of decompensation (Tr. 355-367).

30. On March 4, 2010, when Plaintiff was seen by psychiatrist Baxi at Northeast Counseling, she said that she was not doing well. She was thinking a lot about her past abuse. She was unable to sleep well at night. Abilify caused nausea and Seroquel made her "space out." Dr Baxi observed that Plaintiff's psychomotor activity was decreased. Her mood was sad and her affect, constricted. Her insight was poor. Diagnosis remained Mood Disorder, NOS; Posttraumatic Stress Disorder, and Marijuana Abuse. Plaintiff was told to continue taking Celexa and BuSpar. Dr. Baxi added Saphris to see if, in combination with Celexa, it would help with her moods (Tr. 442).

31. On March 19, 2010, Plaintiff told Dr. Buyo that her low back pain was constant and

associated with back stiffness, hip pain, and leg weakness. Her neck pain was also persistent. Plaintiff had an unsuccessful course of physical therapy but still had not been able to have MRIs. She had a sciatic list and was limping and using a cane. Soma and Vicodin were prescribed and cervical and lumbar MRIs were suggested (Tr. 394-395).

32. When Plaintiff was seen by Dr. Buyo on April 16, 2010 she was complaining about sleep problems. She has a sciatic list and was using a cane and limping. Ambien was prescribed; she was also taking Vicodin and Soma. She was referred to pain management (Tr. 392-393).

33. On April 29, 2010, Plaintiff told Dr. Buyo that she was going out of town for a month and needed medication refills. She had a sciatic list and was still using a cane and limping. Dr. Buyo prescribed Soma and Percoct (Tr. 390-391).

34. On May 26, 2010, Plaintiff told Dr. Buyo that she fell while she was in New York and twisted her neck. She was still limping, with a sciatic list, and using a cane. Percocet was prescribed (Tr. 387-388).

35. On June 2, 2010, Plaintiff returned to psychiatrist Baxi and told him that she was having problems with her back and her insurance would not approve her for an MRI. Her pain medications did not help much. When her pain got to be too much, she got emotional and sometimes, angry. Dr. Baxi observed that Plaintiff's mood was euthymic and her affect, flat. Diagnosis was the same. She was told to continue with her current medications and try to use what she was learning in therapy about how to relax herself and deal with stress (Tr. 443). Objectively, Plaintiff was calm and cooperative; she denied suicidal or homicidal ideation and was not overtly psychotic despite getting emotional at times secondary to her pain (Tr. 443).

36. On June 10, 2010, Plaintiff told Dr. Buyo that for the past week, she had been feeling restless at night. She had previously been diagnosed with restless leg syndrome and found that

Ambien helped with the restlessness. Plaintiff had a sciatic list and was using a cane and limping. Percocet and Ambien were prescribed (Tr. 385-386).

37. On July 7, 2010, Plaintiff told Dr. Buyo that she was recently discharged from the hospital and told to ask for an order for back and neck MRIs. On this day, Plaintiff presented with a painful, swollen, and stiff right fifth finger which she hyperextended at home. She had trouble moving/flexing it. It was swollen and tender. Plaintiff was told to gently move it. Her gait was normal. She was referred to pain management and physical therapy for her sciatica and cervicalgia (Tr. 381-382).

38. On July 8, 2010, Plaintiff returned to psychiatrist Baxi and said she was doing better. She explained that she was recently hospitalized because she became depressed and suicidal about not being able to have an MRI. During her hospitalization, she was placed on Seroquel, Lithium, and Celexa. She felt that she was doing better and was sleeping better but she still lacked any motivation and her back was still bothering her. She denied suicidal thoughts. Dr. Baxi observed that Plaintiff's mood was sad and her affect, constricted. Her insight was "very poor." Diagnosis was unchanged. Plaintiff told Dr. Baxi that she had not used marijuana since her discharge from the hospital. She refused to go to the partial hospitalization program. She was scheduled to see her therapist on Monday (Tr. 444). Objectively, Plaintiff was alert and aware of her surroundings (Tr. 444). Although her mood was sad and her affect constricted, she was not overtly psychotic (Tr. 444). She denied any side effects from her medications (Tr. 444). There was no diagnosis for Axis II, which would have indicated a personality disorder (Tr. 444).

39. On July 16, 2010, Plaintiff presented to Dr. Buyo with a number of complaints including weakness, nausea, lightheadedness, and headache. It was thought that these symptoms might be due to a change in her psychotropic medications and she was advised to follow up with her psychiatric

team about this (Tr. 377-379). On review of systems, Plaintiff specifically denied any back pain or neurological problems (Tr. 378). Her mental status on examination was alert; she was cooperative and did not appear in acute distress or "sickly" (Tr. 378).

40. On July 26, 2010, Plaintiff told physician's assistant Dorothy Perillo (of Dr. Baxi's practice) that she was not happy with her current medications. She was experiencing restless legs from Seroquel. Plaintiff reported that her depression and anxiety were increasing and she was more tearful. Her sleep was improved but she was having several panic attacks per week. She was also complaining of nausea and dizziness. Ms. Perillo increased Plaintiff's Effexor to treat her depression and anxiety and switched her to the XR form of Seroquel to try to reduce its side effects (Tr. 445). Despite Plaintiff's subjective complaints, her mental assessment on examination was essentially unremarkable (Tr. 445).

41. On August 16, 2010, Plaintiff told Ms. Perillo that she was doing well with Pristiq and Seroquel XR. She was sad about not being able to have an MRI. Her mood was stable (Tr. 446). Other than some increased bowel movements, Plaintiff reported no other medication side effects (Tr. 446). Her sleep and appetite were normal; she was calm and cooperative (Tr. 446). Her mental assessment on examination was essentially unremarkable (Tr. 446). There was no diagnosis for Axis II, which would have indicated a personality disorder (Tr. 446).

42. On August 23, 2010 Plaintiff spoke to Dr. Buyo's office to request a prescription for an MRI of her back and neck. She said that she had no medical insurance but needed the study done for her disability case (Tr. 375).

43. On September 1, 2010, Plaintiff told Ms. Perillo that she was doing well on her medications and had no side effects. She denied depression, anxiety, or mood swings (Tr. 447).

44. On September 8, 2010, Plaintiff had a conversation with Dr. Buyo's office about the cost

of an MRI that was not covered by health insurance (Tr. 374).

45. On September 29, 2010, Plaintiff told Ms. Perillo that for financial reasons, she would not be able to have the MRIs. She reported being more depressed and tearful and attributed it to her pain. She was sleeping only 5 hours. She was "very emotional" (Tr. 448). Despite Plaintiff's subjective complaints, her mental assessment on examination was essentially unremarkable (Tr. 448). There was no diagnosis for Axis II, which would have indicated a personality disorder (Tr. 448).

46. On October 28, 2010, in follow-up with Ms. Perillo, Plaintiff reported getting weepy when watching certain television shows but not feeling depressed at other times. Sleeping was a problem secondary to dizziness. She was having occasional anxiety attacks (Tr. 449). Plaintiff appeared calm and cooperative, with no overt psychosis (Tr. 449). Despite Plaintiff's subjective complaints, her mental assessment on examination was essentially unremarkable (Tr. 449). There was no diagnosis for Axis II, which would have indicated a personality disorder (Tr. 449).

47. On December 6, 2010, in follow up with Dr. Buyo, Plaintiff reported that her depression and anxiety had been increasing since she took her husband back in May. She felt that she had to take him back for financial reasons. She was having persistent thoughts about her mother committing suicide. She described her anxiety as feeling like apprehension and nervousness. Her depression was characterized by episodes of spontaneous crying and feelings of sadness and nervousness. Her insomnia persisted as well (Tr. 371-372). On examination, Plaintiff was mentally alert, and appeared cooperative (Tr. 372). Lower extremity examination was normal (Tr. 372). Neurologically, she was alert and fully oriented, with no impairment in recent or remote memory, and with normal sensation and coordination (Tr. 372).

48. On February 11, 2011, Plaintiff told Ms. Perillo that she had been sick with the flu. Her

increased dose of Seroquel XR had helped with sleep. She was still depressed and tearful several days a week and had occasional suicidal thoughts but said she would not follow through because of her children. Living with her husband was stressful (Tr. 488). Plaintiff felt that being under stress with her spouse was the cause of all of her depression (Tr. 488). Her mental assessment on examination was essentially unremarkable (Tr. 488). There was no diagnosis for Axis II, which would have indicated a personality disorder (Tr. 488).

49. On March 10, 2011, Plaintiff told Ms. Perillo that she continued to have problems with her husband and wanted to leave him. Her depression and tearfulness were increasing because of his verbal abuse. She was having suicidal thoughts. Plaintiff was advised to have her lithium level checked so that they could consider increasing it to treat her depression (Tr. 490). Despite Plaintiff's subjective complaints, her mental assessment on examination was essentially unremarkable (Tr. 490). There was no diagnosis for Axis II, which would have indicated a personality disorder (Tr. 490).

50. On April 22, 2011, Plaintiff told Ms. Perillo that she moved in with her brother a month earlier. She was doing well with her medications. She felt down at times but her sleep was normal and she wasn't having the same negative thoughts (Tr. 491). Plaintiff's appetite was fair, and she was calm and cooperative (Tr. 491). There was no overt psychosis (Tr. 491). Her mental assessment on examination was essentially unremarkable (Tr. 491).

51. On June 3, 2011, Plaintiff told Ms. Perillo that she was more depressed. She described being tearful on a daily basis. She had been having suicidal thoughts, most recently 5-6 days before this visit. She had been under a lot of stress. Her brother reportedly had two heart attacks. She was going to New York the next day to see her daughter. Lithium levels had to be rechecked before it could be increased (Tr. 492). Despite Plaintiff's subjective complaints, her mental assessment on

examination was essentially unremarkable (Tr. 492). Plaintiff did not want her medication changed (Tr. 492).

52. On July 1, 2011, in follow-up with Ms. Perillo, Plaintiff was still depressed with occasional suicidal thoughts but no intent/plan. She was taking her medications regularly. She was under stress at her brother's house. She was to call about an adjustment to her Lithium; she did not want to change her other medications (Tr. 493). Plaintiff did not want to change her medications because she felt they were working (Tr. 493). Despite Plaintiff's subjective complaints, her mental assessment on examination was essentially unremarkable (Tr. 493).

53. On July 28, 2011, Plaintiff was seen by Dr. Baxi. She told him that her sister-in-law threw her out of the house and she was living with her husband again. Initially, she was very upset about this but she had been settling down. Her mood was euthymic and her affect, appropriate. Her grooming and hygiene were fair. Diagnosis was the same. Her Lithium level was low on testing so it was going to be re-tested and if it was still low, it might be increased (Tr. 494). Plaintiff was calm and cooperative; she denied suicidal or homicidal ideation; and she was not overtly psychotic (Tr. 494). There was no diagnosis for Axis II, which would have indicated a personality disorder (Tr. 494).

54. When Plaintiff saw Dr. Baxi on August 25, 2011, she told him that she had been in Bloomsburg Hospital for 11 days and was discharged about a week earlier. She was currently staying in a women's shelter because she was having problems with her husband. Reportedly, even after her discharge from the hospital, she was still having suicidal thoughts and thoughts of hurting (hitting but not killing) her husband. Her suicidal thoughts persisted. She reported having racing thoughts and was not able to sleep well. Dr. Baxi observed that Plaintiff's mood was depressed and her affect, appropriate. Her insight and judgment were poor (Tr. 496). Diagnosis was: Axis I: Mood Disorder

Posttraumatic Stress Disorder Marijuana Abuse Axis II: no diagnosis Axis III: chronic neck and back pain Axis IV: moderate Axis V: 30. With Plaintiff's consent, Dr. Baxi sent Plaintiff for voluntary admission to a psychiatric hospital (Tr. 496).

55. On September 27, 2011, Ms. Perillo noted that Plaintiff had been hospitalized twice at Bloomsburg Hospitaland was living with her husband again. Her suicidal thoughts persisted. She had considered overdosing on her medications but did not do it because of her family. She reported feeling very anxious. She was getting 5-6 hours of sleep at night with Ambien. She described being tearful on a daily basis. Ms. Perillo reviewed Plaintiff's case with Dr. Baxi who recommended that Plaintiff start the partial hospitalization program. Plaintiff told Ms. Perillo that she would decide after discussing it with her therapist and case manager (Tr. 497). Despite Plaintiff's subjective complaints, her mental assessment on examination was essentially unremarkable (Tr. 497). Specifically, Ms. Perillo assessed no suicidal or homicidal thoughts, plans, or intent (Tr. 497). Plaintiff was fully oriented to person, place, and time (Tr. 497). Although she had only fair insight, her judgment was intact (Tr. 497). There were no delusions (Tr. 497). On Axis II (personality disorder), Ms. Perillo indicated no diagnosis (Tr. 497). On Axis III, she assessed a GAF of 55, indicating only moderate symptoms (Tr. 497).

## C.    Hearing Testimony

Plaintiff testified that she was unable to do her job "because of my mental disability because of what my husband put me through" (Tr. 65). But she also testified that her husband was her sole source of income and was paying the bills currently (Tr. 62). She said that she no longer had a medical access card and that the last time she had insurance was "prior to taking my husband back" (Tr. 62). She testified that she was on public assistance "before I took him back" but that her household income was now too high to qualify for public assistance (Tr. 75-76). As to her insurance,

she testified that "they took it away because I was on public assistance, I was collecting food stamps" (Tr. 76). She admitted to smoking marijuana in the past, and testified that she got the money for the marijuana "through my husband" (Tr. 76). Plaintiff appeared at the hearing without a cane or other assistive device (Tr. 74). She testified that she had a cane at home, but was not able to use it "because it bothers me, I can't use it right" (Tr. 74).

In response to questioning from her counsel, Plaintiff testified that she suffered from "panic attacks" mostly because her husband was around her (Tr. 81). She said she would "panic a lot when he's around because I don't know his next move" (Tr. 81). She also stated that she would "jump" if the telephone rang or if her son came from behind and put his shoulders on her (Tr. 81). In answer to a specific question about her concentration, she testified that the only televisions shows that she could "really really be happy and concentrate on are comedies" (Tr. 82). She said that she did not watch anything else because most of the shows that she chose not to watch were "just too emotional" (Tr. 82).

The ALJ asked a VE to assume a hypothetical individual with Plaintiff's vocational profile who was limited to medium work, but with the following additional limitations: limited to occupations requiring no more than simple, routine tasks, not performed in a fast-paced production environment, involving only simple work-related decisions and in general relatively few work place changes; limited to occupations that require no prolonged reading for content and comprehension or mathematical calculations; and limited to occupations that require low stress, defined as only occasional decision making and occasional changes in the work setting (Tr. 87-88).

The VE testified that such individual could not perform Plaintiff's past relevant work, but could perform the medium, unskilled jobs of laundry worker, dry clean checker, and janitor/cleaner (Tr. 88).

The ALJ then asked the VE to assume all of the facts from the first hypothetical question, except that the individual would be limited to light work (Tr. 88). The VE responded that the individual could perform the light, unskilled jobs of ticket taker, retail marker, and recycling clerk (Tr. 88-89).

### D.   ALJ's Decision

The ALJ found that Plaintiff had the "severe" impairments of learning disorder by history, generalized anxiety disorder, depressive disorder, mood disorder, personality disorder, post-traumatic stress disorder, low back syndrome, and marijuana abuse (Tr. 26, Finding No. 3). The ALJ then determined that, despite those impairments, Plaintiff was capable of performing a reduced range of medium work (Tr. 28, Finding No. 5). Relying on the testimony of the VE, the ALJ concluded that a significant number of jobs existed in the national economy that Plaintiff could perform and, thus, she was not disabled under the Act (Tr. 35, Finding Nos. 10-11).

### IV.   Review of ALJ Decision

A five-step evaluation process is used to determine if a person is eligible for disability benefits. See 20 C.F.R. §§ 404.1520, 416.920; see also Plummer, 186 F.3d at 428. If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed any further. See 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. See 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional

capacity (RFC).  20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that she is unable to engage in past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the plaintiff. See 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

### A.      Plaintiff Allegations of Error

### 1. Residual Functional Capacity Finding and Hypothetical Question to Vocational Expert

Plaintiff contends the ALJ's hypothetical question to the VE was deficient because it did not account for her moderate difficulties in social functioning (Pl.'s Br. at 7). Specifically, Plaintiff states the ALJ did not include limitations on interacting with the general public, working with or in proximity to coworkers, or responding appropriately to supervisors.

### a.      Case Law and Analysis

"Plaintiff next argues that the hypothetical to the ALJ was critically deficient, in that it failed to acknowledge plaintiff's restrictions to handle and work with small objects with both hands, and also failed to acknowledge that medications that plaintiff was using would prevent him from working. In view of the scarcity of medical evidence regarding plaintiff's dextral limitations, the ALJ did not err in omitting such limitations from the hypothetical question. See Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005) ('We do not require an ALJ to submit to the vocational expert every impairment alleged by a claimant . . . the ALJ must accurately convey to the vocational expert all of a claimant's credibly established limitations')." Clark v. Astrue, 844 F. Supp. 2d 532, 547 (D. Del. Feb. 15, 2012).

A hypothetical question must accurately portray the claimant's individual physical and mental impairments. Podedworney v. Harris, 745 F.2d 210, 218 (3d Cir. 1984). However, a hypothetical question need reflect only those impairments that are supported by the record. Ramirez v. Barnhart, 372 F.3d 546, 552 (3d Cir. 2004).

In the decision, the ALJ determined that Plaintiff had moderate difficulties in social functioning (Tr. 27). The ALJ made this determination at steps two and three of the sequential evaluation process. 20 C.F.R. §§ 404.1520(a)(4)(ii)-(iii), (c)-(d), 416.920(a)(4)(ii)-(iii), (c)-(d). The ALJ noted Plaintiff's function report, in which she stated that she stopped group therapy because she was uncomfortable around people (Tr. 27).

In the decision, the ALJ found, "[t]he claimant was treated by Dr. Patricia Berliner for her mental impairments. In a letter dated December 9, 2008, Dr. Berliner stated that the claimant had been prescribed medication for pain and depression. It was her opinion that she was not emotionally able to work, however, in a medical source statement dated August 28, 2009 she reported that, while the claimant had slight to moderate some problems in understanding, remembering and carrying out simple and detailed instructions and none to slight limitations in responding appropriately to supervision, coworkers and work pressures in a work setting, she would be capable of working. She said that she treated the claimant for 3 months from September 8, 2008 through December 9, 2008 and had not been in contact since that time." (Tr. 32).

The ALJ also noted, "[s]ubsequent treatment records have revealed, that when compliant with medication and therapy, the claimant's condition had improved." (Tr. 33).

Despite Plaintiff's other acknowledged social activities, the ALJ gave her the benefit of the doubt and found moderate difficulties in social functioning (Tr. 27). The ALJ also essentially adopted the report of the state agency psychologist, who opined on a psychiatric review technique

form (PRTF) (Tr. 355-67) that Plaintiff had moderate difficulties in maintaining social functioning (Tr. 365).

However, as the ALJ correctly noted in her decision, the limitations noted in the "B" criteria on the PRTF are not a residual functional capacity assessment, but are used for the sole purpose of rating the severity of a mental impairment at steps two and three of the sequential evaluation process (Tr. 28). See Social Security Ruling (SSR) 96-8p, 1996 WL 374184 at *4.

Only after arriving at the step-two and step-three determinations did the ALJ go on to assess Plaintiff's residual functional capacity (RFC). The ALJ reasonably accounted for all of Plaintiff's limitations from her mental impairments by limiting her to a significantly reduced range of medium work (Tr. 28, Finding No. 5). Although the ALJ gave Plaintiff the benefit of the doubt and found moderate limitations in social functioning at steps two and three of the sequential evaluation, the undisputed medical evidence shows consistently that Plaintiff's treating sources assessed her as alert, fully oriented, and cooperative (Tr. 230, 269-70, 274, 285, 372, 378, 436, 439-41, 443, 445-49, 488, 490-94, 497). Plaintiff's medical providers consistently declined to diagnose Plaintiff with a personality disorder (Tr. 444, 448-49, 488, 490, 494, 497).

Further, Plaintiff testified, and also told her therapist, that it was conflict with her husband, rather than with her co-workers, that caused her mental impairments (Tr. 65, 488). And most significantly, Plaintiff stated that she had no problem getting along with her family, friends, neighbors, or others; got along very well with authority figures; and never had any problems getting along with other people on the job (Tr. 187-88).

Plaintiff argues she has moderate difficulty in maintaining social functioning, and the ALJ assessment at steps two and three of the sequential evaluation process would prevent her from performing the jobs identified by the VE. Plaintiff relies on Weinsteiger v. Barnhart, No.

09-CV-1769, 2010 WL 331903 at *9-11 (E.D. Pa. Jan. 25, 2010) (Pl.'s Br. at 8). In <u>Weinsteiger</u>, the court held that the ALJ's hypothetical question limiting Plaintiff to simple, repetitive, low-stress work did not properly account for Plaintiff's moderate limitations in social functioning. <u>Weinsteiger</u>, 2010 WL 331903 at *5, *9. However, in the instant case, all of the jobs the VE identified were unskilled jobs (Tr. 88-89). The Commissioner's rulings acknowledge that unskilled jobs, at all levels of exertion, involve dealing primarily with objects, rather than with data or people. SSR 85-15, 1985 WL 56857 at *4. Thus, even if Plaintiff's moderate difficulty in social functioning would impact her ability to get along with co-workers or the public (and the evidence as discussed above indicates that it most likely would not), her impairments would not prevent her from performing the unskilled jobs identified by the VE.

Since the VE identified a significant number of unskilled, medium and light jobs in the national economy that could be performed by a hypothetical individual with the same vocational profile and RFC as Plaintiff, substantial evidence supports the Commissioner's final decision that Plaintiff was not disabled under the Act. <u>See Chrupcala v. Heckler</u>, 829 F.2d 1269, 1276 (3d Cir. 1987) (which provides that the testimony of a VE constitutes substantial evidence for purposes of judicial review where the hypothetical questioning of the ALJ fairly encompasses an individual's significant limitations that are supported by the record).

"Because the hypothetical posed to the vocational expert reflected claimant's RFC, and that RFC is supported by substantial evidence, the Court holds that the hypothetical was sufficiently accurate. <u>See Covone v. Commissioner Social Sec.</u>, 142 Fed. Appx. 585, 2005 WL 1799366 (3d. Cir. July 29, 2005). As the ALJ's decision is supported by the testimony of the vocational expert, the decision is supported by substantial evidence and is, therefore, affirmed. <u>See Plummer</u>, 186 F.3d at 431." <u>Robinson v. Astrue</u>, No. 10–1568, 2011 WL 1485977, at *13 (W.D. Pa. Apr. 19, 2011).

Thus, the ALJ's RFC finding and hypothetical question includes only "credibly established limitations" and not all impairments alleged by claimant, Rutherford, 399 F.3d at 554. Accordingly, the ALJ relied on the record and testimony in determining Plaintiff's residual functional capacity and hypothetical question, and the findings are supported by substantial evidence.

### 2. ALJ Review of Medical Opinions and Evidence

Plaintiff contends the ALJ erred in finding the RFC assessment without properly evaluating the medical opinions and evidence (Pl.'s Br. at 9).

### a.    Case Law and Analysis

The weight afforded to any medical opinion is dependent on a variety of factors, including the degree to which the opinion is supported by relevant evidence and consistent with the record as a whole. 20 C.F.R. § 404.1527(c)(3)-(4). Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion. 20 C.F.R. § 404.1527(c)(4). A treating physician's opinion does not warrant controlling weight under the regulations unless it is well supported by clinical and laboratory diagnostic findings and consistent with other substantial evidence. 20 C.F.R. § 404.1527(c)(2); Plummer, 186 F.3d at 429. If a treating source's opinion is not entitled to controlling weight, the factors outlined in 20 C.F.R. § 404.1527(c)(2) are used to determine the weight to give the opinion. Id. The more a treating source presents medical signs and laboratory findings to support his medical opinion, the more weight it is entitled. Id. Likewise, the more consistent a treating physician's opinion is with the record as a whole, the more weight it should be afforded. Id. The Commissioner is not bound by a treating physician's opinion, and may reject it, if there is a lack of clinical data supporting it, or if there is contrary medical evidence. Lyons-Timmons v. Barnhart, 147 F. App'x 313, 316 (3d Cir. 2005).

The ALJ, not the treating or examining physician, must make the disability and residual

functional capacity determination. 20 C.F.R. § 404.1527(d)(1)-(2); Chandler v. Comm'r of Soc. Sec., 667 F.3d 356 (3d Cir. 2011). "The law is clear that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity." Chandler, 667 F.3d at 361; Coleman v. Astrue, 2012 WL 3835403, at *2 (3d Cir. Sept. 5, 2012) (holding that ALJ may choose non-examining physician opinion over treating physician opinion as long as medical evidence not rejected for wrong reason or no reason).

The case law in this circuit makes clear that physician opinions are not binding upon an ALJ, and that an ALJ is free to reject a medical source's conclusions. Chandler, 667 F.3d 356 at 361. In so doing, however, the ALJ must indicate why evidence was rejected, so that a reviewing court can determine whether "significant probative evidence was not credited or simply ignored." Cotter v. Harris, 642 F.2d 700, 705 (3d Cir.1981). Mistick v. Colvin, No. 12-cv-1031, 2013 WL 5288261 (W.D. Pa. Sept. 18, 2013).

Plaintiff notes that the ALJ gave "little weight" to the assessment of the state agency reviewer, Dr. Bonita, and the ALJ's statement that she assessed "greater limitations" than those assessed by Dr. Bonita (Pl.'s Br. at 11). The record shows that Dr. Bonita assessed Plaintiff's RFC at light work (Tr. 349), while the ALJ assessed an RFC for medium work (Tr. 28, Finding No. 5).[2] It appears the ALJ mistyped this phrase because she clearly assessed fewer limitations than Dr. Bonita. Perhaps the ALJ intended to state that she assessed a "greater functional ability," rather than "greater limitations."

---

[2] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b). Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. 20 C.F.R. §§ 404.1567(c), 416.967(c).

The ALJ stated, "I find that the claimant can do a range of medium work. The above finding is consistent with the objective medical evidence including measurable findings in clinical examinations. It is also consistent with the claimant's activity level as indicated by her stated ability to cook, clean, vacuum, shop, and socialize." (Tr. 34).

But in any event, there is ample support in the record for the ALJ's RFC assessment. First, the RFC is not a medical opinion but, instead, an administrative finding dispositive of a case. 20 C.F.R. §§ 404.1527(d), 416.927(d). Final responsibility for deciding issues such as a claimant's RFC is specifically reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). At the administrative hearing level, RFC assessment is the responsibility of the ALJ. 20 C.F.R. §§ 404.1546(c), 416.946(c). Naturally, the ALJ bases her assessment on an analysis of the medical evidence, but she is not bound by the opinion of any treating, examining, or non-examining physician. Chandler, 667 F.3d at 361.

The record shows that although Plaintiff was observed walking with a limp on arrival at the emergency department, no neurological deficits were noted (Tr. 211). Plaintiff told Dr. Alley that her back pain was precipitated by heavy weight lifting, and developed after many years of heavy lifting (Tr. 284). Subsequent examinations revealed no joint or muscle pain and no extremity swelling (Tr. 278, 280). Dr. Buyo noted that Plaintiff had a normal posture and gait (Tr. 270). Dr. Vita made the same observation several months later (Tr. 316). At about that same time, Plaintiff told Dr. Vilushis that she initially hurt her back when she was packing to leave her husband and was lifting a lot of boxes (Tr. 328). She re-injured her back after again doing some lifting, which she knew she was not supposed to do (Tr. 328).

The ALJ found that "[t]he record devoid of any imaging, EMG or specialty consultations . . . [and] [Dr. Vilushis's] opinion appears to be based on subjective complaints, not on imaging or

objective testing." (Tr. 31, 33).

In view of the objective evidence in the record, the ALJ reasonably accounted for Plaintiff's physical limitations, clearly caused or exacerbated by heavy lifting, by eliminating any heavy-duty work, 20 C.F.R. §§ 404.1567(d), 416.967(d), and limiting Plaintiff to only medium work (Tr. 28, Finding No. 5). Even if the ALJ had adopted Dr. Bonita's assessment for light work (Tr. 349), the decision would be fully supported. According to Plaintiff's vocational profile, she is presumptively not disabled whether limited to medium or light work. See 20 C.F.R. Pt. 404, Subpt. P, App. 2 (compare grid rules 203.26 and 202.18). And, after identifying a significant number of jobs in the national economy at the medium level of exertion that an individual with Plaintiff's vocational profile and RFC could perform (Tr. 88), the VE identified a significant number of light jobs as well (Tr. 88-89).

Thus, for all intents and purposes, the ALJ actually made an alternative finding of not disabled at the light RFC. The burden lies with Plaintiff to demonstrate harm from such error that would have changed the ALJ's decision, but she has not done so here. Shinseki v. Sanders, 556 U.S. 396, 409-10 (2009); see also Molina v. Astrue, 674 F.3d 1104, 1111, 1115-22 (9th Cir. 2012). "No principle of administrative law 'requires that we convert judicial review of agency action into a ping-pong game' in search of the perfect decision." Coy v. Astrue, No. 08-1372, 2009 WL 2043491, at *14 (W.D. Pa. July 8, 2009) (quoting NLRB v. Wyman-Gordon Co., 394 U.S. 759, 766 n.6 (1969)); see also Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result").

Finally, Plaintiff argues the ALJ's RFC determination failed to adequately account for her mental limitations (Pl.'s Br. at 12). Although Plaintiff had several psychiatric hospitalizations, she

responded well to those in-patient treatments, and her problems were reported to have resolved (Tr. 241). Mental status examinations consistently found Plaintiff to be alert and fully oriented, with clear and coherent speech, good attention and concentration, and logical and coherent thought processes (Tr. 227, 230, 269-72, 316, 444, 497). She displayed no signs of being psychotic (Tr. 444, 449, 494). Plaintiff's hearing testimony indicates that it was her preference for comedy over "emotional" TV shows that dictated her TV viewing habits, rather than any problems with concentration (Tr. 82). And although Plaintiff claimed to suffer from "panic attacks," what she described during her hearing testimony was nothing more than a case of "jittery nerves" (Tr. 81), as opposed to the classic symptoms of panic attacks, which involve acute intense anxiety, agoraphobia, or schizophrenia.[3]

Plaintiff states the ALJ may not substitute her own conclusions, opinions or judgment for that of the physicians who present competent medical evidence of disability. Pl. Br. at 11, Doc. 8. While this is true, the Third Circuit found in Chandler, 667 F.3d at 362, that the district court had erred in concluding that the "ALJ had reached its decision based on its own improper lay opinion regarding medical evidence." Id. "The ALJ– not treating or examining physicians or State agency consultants –must make the ultimate disability and RFC determinations." Id. at 361 (citing 20 C.F.R. 404.1527(e)(1), 404.1546(c)).

Plaintiff states that at the hearing she testified she has become more limited since she completed her Function Report (Tr. 71-73). Pl. Br. at 13, Doc. 8.

The regulations require the ALJ to find that Plaintiff's disability is expected to last continuously for a year. To receive disability or supplemental security benefits, Plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has

---

[3] See Dorland's Illustrated Medical Dictionary, 159 (28th ed. 1994).

lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A) (emphasis added). Thus, Plaintiff's impairments and inability to do activities must also meet the durational requirement.

"[T]he ALJ is not bound to accept every limitation that is found by a medical professional, but rather only the ones that she finds are credibly established by the record. See Salles v. Comm'r of Soc. Sec., 229 Fed. Appx. 140, 147 (3d Cir. 2007). Contrary to Plaintiff's assertion, the ALJ did not err by incorporating into her RFC finding only those limitations which she found to be credibly established by the objective medical evidence and the Court finds that the ALJ's RFC determination as well as her ensuing hypothetical to the vocational expert both enjoy the support of substantial record evidence. Finally, the Court finds that the ALJ evaluated the medical opinion evidence properly and in accordance with the applicable rules and regulations and that substantial record evidence supports her evaluation. The ALJ gave a detailed explanation for why the medical source statements from the mental health providers were not given controlling weight the ALJ discussed at length her justification for why the medical source statements from Dr. Jahangeer and Ms. Walker were inconsistent with and contradicted by the other medical evidence of record, including their own notes and prior findings. The Court finds that the ALJ discharged her duty because she (i) demonstrated her consideration of all the relevant medical evidence, (ii) addressed the contradictory evidence in the record which conflicted with her findings, and (iii) explained why that contrary evidence was rejected or not given controlling weight. See Cotter, 642 F.2d at 705. Indeed, the overarching theme of the ALJ's decision was the complete lack of objective medical evidence which corroborated or even tended to support Plaintiff's complaints of severely disabling impairments and the Court agrees with the ALJ's finding that such corroborating evidence was woefully lacking in the record. Plaintiff's subjective complaints were corroborated only by her own self-reports,

which—for the reasons discussed by the ALJ—were not particularly credible. To that end, the Court finds that the ALJ's credibility determination is well-supported by the record and that Plaintiff's arguments to the contrary are completely unpersuasive, particularly given the minimal treatment record, the inconsistencies in the record that were highlighted and discussed by the ALJ . . . Accordingly, the Court concludes that substantial record evidence supports the ALJ's determination of non-disability." Stewart v. Astrue, No. 13–73, 2014 WL 29035, at *1, n.1 (W.D. Pa. Jan. 2, 2014) (emphasis added).

Similarly in this case, the record does not support Plaintiff's assertions of disabling severity. Plaintiff's contentions of error are inconsistent with the objective evidence and activities of daily living. From the ALJ's extensive review, substantial evidence supports the weight accorded to the allegations and opinions of record.

### b.    Plaintiff's GAF Scores

Plaintiff states it is unreasonable for the ALJ to find Plaintiff's GAF scores are consistent with the conclusion that Plaintiff is limited, but not to a marked degree. (Tr. 34). Pl. Br. at 12-13, Doc. 8. The ALJ found, "subsequent treatment records have revealed, that when compliant with medication and therapy, the claimant's condition had improved. GAF scores improved and remained steady at 55." (Tr. 34). The ALJ further found, "no weight is given to [Dr. Vita's] GAF score of 50 . . . a longitudinal review of the entire record shows that the claimant can function at a much higher level than the consultative examiner has opined." (Tr. 34).

The Diagnostic and Statistical Manual of Mental Disorders-IV, the source of the GAF scale, instructs that a GAF score is based on the symptom severity or level of functioning at the time of the examination. Courts within the Third Circuit have accepted the Commissioner's position that GAF scores are not dispositive of disability. See, e.g., Gilroy v. Astrue, 351 F. App'x 714, 716 (3d Cir.

2009) (explaining that a GAF score of 45 did not warrant remand given that no statement of specific functional limitations accompanied the score); Chanbunmy v. Astrue, 560 F. Supp. 2d 371, 383 (E.D. Pa. 2008).

"We further find no error with respect to the ALJ's evaluation of the Plaintiff's mental impairments in fashioning his RFC. The ALJ found Plaintiff was limited to simple, routine, repetitive tasks not involving fast pace or more than simple work decisions, and could have only incidental collaboration with coworkers and the public and collaboration with the supervisor for about 1/6 of the time. Plaintiff argues that the ALJ's RFC finding failed 'to encapsulate all of the limitations flowing from [his] severe mental illness' and contends that his low GAF score of 45 demonstrates a complete inability to work. The ALJ specifically rejected this GAF score assessed by [the treating psychiatrist], however, as inconsistent with the remaining medical evidence. An ALJ may properly reject a GAF score when it is inconsistent or unsupported by the record as a whole. Torres v. Barnhart, 139 F. App'x 411, 415 (3d Cir. 2005); Blakey v. Astrue, 2010 WL 2571352 at *11 (W.D. Pa. 2010)." Klein v. Colvin, No. 13-cv-1497, 2014 WL 2562682, at *11 (W.D. Pa. June 06, 2014).

"Plaintiff next argues that the findings of consultative examiner [ ] were not properly credited by the ALJ. The ALJ noted the marked and extreme limitations findings, and low GAF score, assessed by [the consultative examiner] in his decision. The ALJ found—as did [the state agency evaluator]—that these findings were inflated, and not an accurate representation of Plaintiff's mental health history. In support of his position, the ALJ cited to Plaintiff's psychiatric treatment at Safe Harbor between October 2009 and October 2010, which revealed a marked—and sustained—increase in Plaintiff's GAF scores, as well as improved mental functioning. Observations by [the consultative examiner] about Plaintiff's appearance were at odds with those at Safe Harbor,

as was the anomalous diagnosis of PTSD. Further, [the state agency evaluator] concluded based upon her evaluation of the medical record, that [the consultative examiner's] findings were out of proportion to what was found in Plaintiff's mental treatment history. Her limitations findings did not exclude Plaintiff from finding work. The court, therefore, finds that the ALJ adequately supported his decision to accord [the consultative examiner's] findings diminished weight with substantial evidence from the medical record, particularly the lengthy treatment record from Safe Harbor, the latter portion of which revealed significant improvement in Plaintiff's mental status. Lastly, to the extent that Plaintiff argues that the ALJ erred in failing to accommodate [the consultative examiner's] finding of marked limitation with respect to interacting with the public, the ALJ clearly indicated that the work which Plaintiff could sustain would not include frequent interaction with the public. Specifically, the ALJ stated that 'the claimant has a need to avoid repetitive reaching, any climbing, and frequent interaction with the general public. As such, Plaintiff's argument is moot.' See Lamb v. Colvin, No. 12-cv-137, 2013 WL 5366260, at *10 (W.D. Pa. Sept. 24, 2013).

Similarly in this case, the ALJ weighed the evidence in the record and accommodated Plaintiff's mental impairments by limiting the residual functional capacity to a range of medium exertion with the restriction to unskilled work.

## V.    Conclusion

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1382c; Brown, 845 F.2d at 1213; Johnson, 529 F.3d at 200; Pierce, 487 U.S. at 552; Hartranft, 181 F.3d at 360; Plummer, 186 F.3d at 427; Jones, 364 F.3d at 503.

Substantial evidence is less than a preponderance of the evidence, but more than a mere

scintilla of evidence. It does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971).

Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. Monsour Med. Ctr., 806 F.2d at 1190. Here, a reasonable mind might accept the evidence as adequate, and the Court will affirm the decision of the Commissioner pursuant to 42 U.S.C. § 405(g).

An appropriate order in accordance with this memorandum to deny Plaintiff's appeal will follow.

Dated: September 30, 2014                                      s/Gerald B. Cohn
                                                    _____
                                                         GERALD B. COHN
                                                    UNITED STATES MAGISTRATE JUDGE